# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

TERRAL HARDY, et al.,                    :
                                         :
              Plaintiffs,     :
                                         :
v.                                       :        NO. 3:06cv833 (MRK)
                                         :
TOWN OF GREENWICH,                       :
                                         :
              Defendant.      :

## RULING AND ORDER

Pending before the Court is Defendant's Supplemental Memorandum [doc. # 113-3] (Def.'s Supp. Mem.) arguing that the First Selectman is the final policymaker for the Town of Greenwich for all claims in this case.[1]  Plaintiffs have conceded that the First Selectman is the final policymaker for their hostile work environment claims, as well as Officer Brown's claim regarding Defendant's failure to promote him to Sergeant.  *See* Pls.' Response to Def.'s Mot. Regarding the Policy Maker for 42 U.S.C. § 1983 [doc. # 140] (Pls.' Resp.) at 1.  However, the parties do not agree on the identity of the final policymaker for decisions made with respect to specialized units and assignments.  On July 26, 2009, the Court issued a Ruling and Order [doc. # 143] in which it reserved judgment on this question until hearing evidence at trial.  Having now heard the trial evidence, and taking into consideration the arguments of the parties on this question, the Court rules that the First Selectman is the final policymaker for all claims, including Plaintiffs' claims regarding specialized units and assignments.  The Court bases its decision on the testimony at trial and the trial exhibits of both parties.

---

[1]  The Court refers readers to its decision on Defendants' motion for summary judgment for background facts regarding this case.  *See* Memorandum of Decision [doc. # 96].

In a lawsuit under 42 U.S.C. § 1983, a municipality may not be held liable on a theory of *respondeat superior*. *See Monell v. Department of Social Servs.*, 436 U.S. 658, 694 (1978). A municipality may be held liable under § 1983 if the conduct that caused the constitutional deprivation was undertaken pursuant to a policy or custom of the municipality. *See id.* at 690-91. However, in such circumstances, the municipality cannot properly be held liable unless the "injury was inflicted by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 121-22 (1988); *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000). As the Supreme Court has explained, "only those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability." *Praprotnik*, 485 U.S. at 123 (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 483 (1986) (plurality opinion)). Furthermore, a municipal officer subjects a municipality to § 1983 liability *only* "where a deliberate choice to follow a course of action is made form among various alternatives by the official or officials responsible for establishing final policy *with respect to the subject matter in question*." *Pembaur*, 475 U.S. at 481 (emphasis added). An official does not become a final policymaker in a particular area simply by exercising discretion in that area. *See id.* at 481-82; *Jeffes*, 208 F.3d at 57 ("It does not suffice for these purposes that the official has been granted discretion in the performance of his duties."). In order to be a final policymaker, the official must have the authority to make policy for the municipality. That authority "may be granted directly by a legislative enactment or *may be delegated* by an official who possesses such authority . . . ." *Pembaur*, 475 U.S. at 482-83 (emphasis added).

The identity of the final policymaker is a question of law to be determined by this Court prior to charging the jury. *See Praprotnik*, 485 U.S. at 124-26; *see also Jett v. Dallas Indep. Sch. Dist.*,

491 U.S. 701, 737 (1989) ("[T]he identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge *before* the case is submitted to the jury."); *Jeffes*, 208 F.3d at 57.  In making this determination, the Court is to be guided by state law.  *See Praprotnik*, 485 U.S. at 124-25; *Jett*, 491 U.S. at 737; *Jeffes*, 208 F.3d at 57.  "Reviewing the relevant legal materials, including state and local positive law, as well as custom or usage having the force of law, . . . the trial judge must identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue." *Jett*, 491 U.S. at 737 (internal quotations and citations omitted); *see also Jeffes*, 208 F.3d at 57.  Finally, "[w]here a plaintiff relies not on a formally declared or ratified policy, but rather on the theory that the conduct of a given official represents official policy, it is incumbent on the plaintiff to establish that element as a matter of law." *Jeffes*, 208 F.3d at 57-58.

In their Supplemental Memorandum [doc. # 113-3], the Defendant claims that, under state and local law, the First Selectman, who is by Charter the Police Commissioner of the Town, is the final policymaker for the Town of Greenwich for all purposes relevant to this case.  *See* Def.'s Supp. Mem. [doc. # 113-3] at 3; *see also* Def.'s Supp. Br. on the Identity of the Town's Final Policymaker [doc. # 172] at 1.  Plaintiffs counter that, while the First Selectman is the final policymaker for the hostile work environment claim and the Sergeant claim asserted by Detective Brown, the Town has delegated final policymaking authority to the Chief of Police for the purposes of appointments to specialized units.  *See* Pls.' Resp. [doc. # 140] at 1.

The parties' disagreement comes down to a simple question: Did Chief Walters simply exercise *discretion* with regards to specialized units, or did the First Selectman actually *delegate* his

final policymaking authority in this area to Chief Walters?  As the Supreme Court has acknowledged, the law is far from clear where the distinction between discretion and delegation is at issue:

> Special difficulties can arise when it is contended that a municipal policymaker has delegated his policymaking authority to another official. . . . If the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from *respondeat superior* liability. If, however, a city's lawful policymakers could insulate the government from liability simply by delegating their policymaking authority to others, § 1983 could not serve its intended purpose. It may not be possible to draw an elegant line that will resolve this conundrum, but certain principles should provide useful guidance.

*Praprotnik*, 485 U.S. at 126-27; *see also Pembaur*, 475 U.S. at 481-82 (plurality opinion) ("The fact that a particular official – even a policymaking official – has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion.").

One such guiding principles established in *Praprotnik* is particularly relevant in this case:

> When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departure from them, are the act of the municipality.  Similarly, when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies.

485 U.S. at 127.  In *Praprotnik*, the Supreme Court observed that the court of appeals had concluded that "'appointing authorities,' like Hamsher and Killen, who had the authority to initiate transfers and layoffs, were municipal policymakers:

> The court based this conclusion on its findings (1) that the decisions of these employees were not individually reviewed for "substantive propriety" by higher supervisory officials; and (2) that the Civil Service Commission decided appeals from such decisions, if at all, in a circumscribed manner that gave substantial deference to the original decisionmaker.

4

*Id.* at 129 (internal citation omitted).   Notably, the Supreme Court found "these propositions insufficient to support the conclusion that Hamsher and Killen were authorized to establish employment policy for the city  with respect to transfers and layoffs."  *Id.*

The oft-cited footnote 12 from Justice Brennan's opinion in *Pembaur* also provides a hypothetical that is useful in distinguishing between discretion and delegation:

> Thus, for example, the County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy.   If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability, although similar decisions with respect to law enforcement practices, over which the Sheriff *is* the official policymaker, *would* give rise to municipal liability.   Instead, if county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for county liability.   *This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner; the decision to act unlawfully would not be a decision of the Board.   However, if the Board delegated its power to establish final employment policy to the Sheriff, the Sheriff's decisions* would *represent county policy and could give rise to municipal liability*.

475 U.S. at 483 n.12 (emphasis added).

Applying these principles to the case at hand, the Court concludes that while Chief Walters had ~~broad~~ discretion over appointment of particular officers to specialized units, he did not exercise final policymaking authority in this area.   First and foremost, local law clearly establishes the First Selectman, who is also the lone Police Commissioner, as the final policymaker for the Town of Greenwich with regard to employment policy within the Police Department.   *See* Pls.' Trial Ex. 3 (Greenwich Town Charter) § 230(a) ("The Chief of Police may, *subject to the approval of the First Selectman* appoint members of the police force together with the officers thereof and fill any vacancies occurring therein, and promote or demote any member of the force . . . ." (emphasis added)).   No evidence at trial contested this proposition.   Thus, Plaintiffs must show that the First

Selectman delegated this authority to Chief Walters with respect to specialized units.  They have not done so.

To be sure, former First Selectman Lash and former First Selectman Bergstresser both testified at trial that they gave the Chief of Police significant discretion in deciding which particular employee to appoint to specialized units, that they each had little or no involvement with appointments of particular employees to such units, and that they each often learned of the appointments after the fact.  But this discretion, as broad as it may have been, did not amount to a delegation of final policymaking authority to Chief Walters.  Chief Walters was still bound by Town employment policies, including anti-discrimination policies, and Selectman Lash so testified.  *See* Pls. Trial Ex. 7 (Greenwich Police Department Manual) at 14 (describing the Department's anti-discrimination policy); Pls. Trial Ex. 10 (Greenwich Affirmative Action Plan).  First Selectman Lash also testified that when there were new positions, he would discuss with the Chief the qualifications for those whom the Chief would appoint to the new positions.  The First Selectman did not give Chief Walters the discretion to make new employment policies, or to alter or violate existing policies.  Nor did the First Selectman make Chief Walters the final policymaker in practice by turning a blind eye to any complaints that Chief Walters was violating Town policies or by deferring to the Chief on questions of Town policy.  In fact, First Selectman Lash, First Selectman Bergstresser, and Chief Walters all testified that Officers who thought that decisions of the Chief, including employment decisions, violated Town policy could complain directly to the First Selectman, and that the First Selectman had the authority to overrule the Chief.  Indeed, First Selectman Lash and Chief Walters testified that the First Selectman *did* overrule Chief Walters on a personnel matter on at least one occasion, and that on another occasion Chief Walters was

reprimanded by First Selectman Lash as a result of a complaint to the First Selectman from the union on a non-employment related matter.  Despite this testimony, not one of the Plaintiffs in this case ever complained to the First Selectman that he was not appointed to particular positions because of his race or color; nor did they bring their allegations of a racially hostile work environment to the attention of the First Selectman.

Former First Selectman Bergstresser – who, as is relevant to the liability claims in this case, was the First Selectman between November 2002 and December 2003 – did testify that he "delegated" the operation of each Town department to the relevant department head, and that he had no role in the appointment and removal of particular employees from specialized units within the Police Department.  Standing alone, this testimony might suggest that the Chief of Police was actually the final policymaker with regard to specialized units.  However, First Selectman Bergstresser also likened the role of each department head to that of a chief operating officer responsible for administering the Town policies, while the First Selectman was responsible for establishing those policies.  Furthermore, First Selectman Bergstresser testified that he, like First Selectman Lash, had an open door policy for complaints about violations of Town policy.  Thus, the testimony of First Selectman Bergstresser is consistent with other testimony suggesting that the Chief had broad discretion, but not policymaking authority.

In short, the relevant trial testimony and exhibits all point to the conclusion that the First Selectman maintained the ultimate authority when it came to policy decisions relating to personnel in the Police Department and exercised active oversight of the Department, and that Chief Walters was aware of the policymaking and oversight authority of the First Selectman, acting as Police Commissioner.  While Chief Walters had discretion to make individual employment decisions in

7

appointing particular employees to specialized units, he did not have the authority to make employment policy for the Town. "This type of separation of policymaking authority from discretion in making particular employment decisions is precisely the situation contemplated by the Supreme Court in *Pembaur* . . . ." *Looby v. City of Hartford*, 152 F. Supp. 2d 181, 188-89 (D. Conn. 2001).

Faced with similar facts, several courts in this District have reached the same conclusion. For example, in *Looby*, Judge Janet Bond Arterton concluded that the Chief of the Hartford Fire Department was not the final policymaker with respect to personnel decisions within the Department despite broad discretion to make personnel decision. *Id*. at 188-89. The court relied on the language of the Hartford City Charter, as well as the fact that the Chief's discretion was constrained by anti-discrimination policies of the City. *Id*. Similarly, Judge Dominic Squatrito in *Albert v. City of Hartford*, 529 F. Supp. 2d 311 (D. Conn. 2007), found that the Police Chief was not the final policymaker as to the hiring and firing of employees where his discretion was constrained by City policies, including an anti-discrimination policy. *Id*. at 330-31. Finally, in *Knight v. Hartford Police Department*, No. 3:04CV969 (PCD), 2006 WL 1438649 (D. Conn. May 22, 2006), Judge Peter Dorsey concluded that the Police Chief did not have final policymaking authority with respect to promotions despite the broad discretion the Police Chief enjoyed in making particular assignments. *Id*. at *19-*21. Again, the court based its decision on the fact that the Chief was constrained by policies of the municipality, as well as plaintiff's failure to "present[] any evidence showing that the individual defendants had any ability to alter these policies." *Id*. at *21. The cases described above represent only a subset of similar cases in this circuit. *See, e.g.*, *Chin v. New York City Housing Authority*, 575 F. Supp. 2d 554, 565-66 (S.D.N.Y. 2008) (finding that plaintiff's supervisor was not a final policymaker regarding employment practices where the City Charter vested that authority

elsewhere and the supervisor's discretion was constrained by municipal policy); *Allen v. City of New York*, No. 03 Civ. 2829(KMW)(GWG), 2007 WL 24796, at *19-*21 (S.D.N.Y. Jan. 3, 2007) (concluding that the Chief of Police was not a final policymaker for the City regarding treatment of arrestees where municipal law vested the relevant authority in the Police Commissioner, and the Chief had discretion to implement, but not to make, policy in the specific area).

Plaintiffs rely heavily on *Rookard v. Health and Hospitals Corp.*, 710 F.2d 41 (2d Cir. 1983), in support of their argument. *See* Pls.' Resp. to Def.'s Mot. Regarding the Policy Maker for 42 U.S.C. § 1983 [doc. # 140] at 2. *Rookard* is instructive as a case where subordinate officials (in this case, the Executive Director of Harlem Hospital and the Vice President for Corporate Affairs of the New York City Health and Hospitals Corporation, a municipal agency) were delegated enough discretion by the municipality to become *de facto* final policymakers. *See* 710 F.2d at 45. However, the facts of *Rookard* are distinguishable from those of the case at hand. In *Rookard*, the organization was "highly decentralized" and the personnel decisions of the subordinate officials were subject to little or no oversight. *Id*. at 45-46. Furthermore, those officials who ostensibly supervised the subordinate officials were informed of the potential unlawful conduct and declined to intervene. *Id*. at 46. Thus, not only did the subordinate officials exercise discretion, but their supervisors deferred to their decisions even where municipal policy was implicated, thereby crossing the line from discretion to delegation. Nothing remotely similar is presented in this case.

In *Jeffes*, the Second Circuit also found that the County Sheriff was the final policymaker for purposes of the plaintiffs' First Amendment claims. 208 F.3d at 58. However, that decision is also distinguishable from the instant case. *Jeffes* did not involve ordinary personnel and employment decisions, but a "code of silence" among staff at the county jail. *Id*. Furthermore, the County

9

Sheriff was an elected position, and County law made him the final policymaker with respect to operations at the jail. *Id*. at 60. Finally, the Sheriff's decisions regarding management of the jail were not subject to the approval or oversight of any other town official. *Id*. Again, these facts in *Jeffes* differ markedly from those described at trial in this case.

In sum, while Chief Walters certainly enjoyed discretion to decide which employees to appoint to specialized units, that discretion was not unconstrained. Chief Walters's discretion remained subject to the Town's policies and oversight by the First Selectman, acting as Police Commissioner. Plaintiffs have not established that the First Selectman delegated his policymaking authority to Chief Walters. Therefore, the Court concludes that the First Selectman is the final policymaker for all claims in this case, and the jury will be so instructed.

IT IS SO ORDERED.

/s/       Mark R. Kravitz
United States District Judge

**Dated at New Haven, Connecticut: July 22, 2009.**